UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DON WILLIAM SYKES,                    :
                                      :CIVIL ACTION NO. 3:16-CV-1400
            Plaintiff,                :
                                      :(JUDGE CONABOY)
            v.                        :
                                      :
NANCY A. BERRYHILL,[1]                :
Acting Commissioner of                :
Social Security,                      :
                                      :
            Defendant.                :
                                      :

_____

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the

Commissioner's denial of Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act and Social Security

Income ("SSI") under Title XVI.  (Doc. 1.)  He originally alleged

disability beginning on March 2, 2004.  (R. 12.)  The

Administrative Law Judge ("ALJ") who evaluated the claim, Michelle

Wolfe, concluded in her October 7, 2014, decision that Plaintiff's

severe impairments of headaches/migraines status post-

concussion/post-concussion syndrome, cervicalgia, and, as of June

_____

[1]  Nancy A. Berryhill is now the Acting Commissioner of Social
Security.  Pursuant to Rule 25(d) of the Federal Rules of Civil
Procedure which addresses the substitution of parties when a public
officer is replaced, Nancy A. Berryhill should be substituted for
Acting Commissioner Carolyn W. Colvin as the defendant in this
suit.  Fed. R. Civ. P. 25(d).  No further action needs to be taken
to continue this suit by reason of the last sentence of section
205(g) of the Social Security Act, 42 U.S.C. § 405(g), which states
that "[a]ny action instituted in accordance with this subsection
shall survive notwithstanding any change in the person occupying
the office of Commissioner of Social Security or any vacancy in
such office."

2014, seizure disorder did not alone or in combination meet or equal a listed impairment.  (R. 15-17.)  She also found that Plaintiff had the residual functional capacity ("RFC") to perform light work with certain nonexertional limitations and that he was capable of performing jobs that existed in significant numbers in the national economy.  (R. 18-26.)  ALJ Wolfe therefore found Plaintiff was not disabled during the relevant time period.  (R. 26.)

With this action, Plaintiff asserts that the Acting Commissioner's decision should be reversed for the following reasons: 1) the ALJ erred in assessing Plaintiff's RFC; and 2) the ALJ erred in failing to give proper weight to Plaintiff's testimony.  (Doc. 11 at 3.)  After careful review of the record and the parties' filings, the Court concludes this appeal is properly granted.

## I. Background

### A.   *Procedural Background*

Plaintiff protectively filed for DIB and SSI on April 26, 2013.  (R. 12.)  The claims were initially denied on August 13, 2013, and Plaintiff filed a request for a hearing before an ALJ on September 17, 2013.  (*Id.*)  Following the hearing, the ALJ issued her unfavorable decision on October 7, 2014, finding that Plaintiff was not disabled under the Social Security Act during the relevant

time period.[2]  (R. 26.)  On May 10, 2016, the Appeals Council denied Plaintiff's request for review of the ALJ's decision.  (R. 1-6.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)  In the denial, the Appeals Council noted that it had reviewed new information submitted but the new evidence did not provide a basis for changing the ALJ's decision.[3] (R. 2.)  Plaintiff was advised that if she wanted consideration of whether she was disabled after May 23, 2014, she would need to submit a new application for benefits.  (R. 2.)

On July 7, 2016, Plaintiff filed his action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on September 6, 2016.  (Docs. 9, 10.)  Plaintiff filed his supporting brief on October 21, 2016.  (Doc. 11.)   Defendant filed her brief on April 18, 2016.  (Doc. 12.)  Plaintiff did not file a reply brief and the time for doing so has passed.   Therefore, this

---

[2]  ALJ Wolfe explained that *res judicata* barred consideration of the period of time through October 24, 2008, based on the unfavorable decision of the ALJ regarding Plaintiff's previously filed applications.  (R. 12.)  She also explained that, although Plaintiff's attorney amended the onset date to March 2009 at the hearing and alleged that Plaintiff was disabled prior to his date last insured of March 31, 2009, no exact date was presented for an amended onset date to consider, so the decision considered the original onset date of March 2004 to the date of the decision.  (R. 12.)

[3]  The Appeals Council Exhibit List indicates that medical evidence dated November 4, 2014, from William Mattiace, M.D., consisting of one page, was submitted.  (R. 4; *see* R. 591.)

matter is fully briefed and ripe for disposition.

**B.   *Factual Background***

Plaintiff was born on January 2, 1965, and has a GED.  (R. 25, 176; Doc. 11 at 2.)  He has past relevant work as a furniture mover and furniture refinisher/refurbisher.  (R. 25.)

**1.   Impairment Evidence**

In his Statement of the Case, Plaintiff provides a general reference to the records of William Mattiace, M.D., stating that the cited records "well document the problems with respect to migraine headaches."  (Doc. 11 at 2 (citing Exhibits 6F, 11F, 12F and 13F).)  Plaintiff adds that Dr. Mattiace "confirms the inability to work when having a headache that Plaintiff testified to at the hearing.  See Exhibit 13F wherein Dr. Mattiace states: 'he gets daily severe migraine headaches when in the throes of such a headache has is incapable of sedentary work.'" (*Id.* (quoting Exhibit 13F [R. 591]).)  This record is dated November 4, 2014. (*Id.*)  Plaintiff's arguments do not contain any citation to the record.  (*See* Doc. 11 at 3-6.)

ALJ Wolfe provides an extensive review of evidence in her Decision.  (R. 19-24.)  Defendant adopts the facts stated in the ALJ's Decision and highlights certain evidence in her brief (Doc. 12 at 5, 9-12).  In the absence of any summary of evidence from Plaintiff, the Court will repeat excerpts from Defendant's recitation relevant to Plaintiff's alleged errors and provide

additional background evidence related to Plaintiff's headache impairment.

Records indicate that Plaintiff suffered from migraine headaches from the time he was a child.  (R. 495.)  He had headaches a few times a week after an automobile accident in 2004, but by April 2009 he reported chronic daily migraine headaches. (R. 495, 499.)  He was regularly followed by his primary care provider and at the Geisinger Neurology Clinic where his headaches were reported to be occurring on a daily basis in November 2011. (R. 369.)

As noted by Defendant,

> Plaintiff reported that the medication Relpax effectively managed his pain (Tr. 368, 388, 473, 528, 537); that cervical Botox provided 20% pain relief for six months (Tr. 452, 528); and that using a "cold pack" over his forehead helped his symptoms (Tr. 528).
>
> During a May 2009 medical appointment (a preoperative visit for laparascopic surgery to remove a renal mass), Plaintiff reported that he was feeling "good;" he denied acute health concerns; he identified his typical daily activity as walking daily for 30-60 minutes; and he said he could walk up two flights of stairs or climb a steep hill without becoming short of breath (Tr. 19, 206).
>
> Despite his ongoing migraine headache complaints, Plaintiff routinely exhibited normal physical examination findings (Tr. 19-20). . . .
>
> Records from the Interventional Pain Center also revealed normal examination findings (Tr. 20).

5

(Doc. 12 at 9-10.)

More specifically, Plaintiff was followed regularly by William J. Mattiace, M.D., his primary care doctor, and also by Geisinger Neurology Department providers, including John P. Carlson, M.D.  At his August 2008 visit with Dr. Mattiace, Plaintiff reported that he usually got a headache if he missed a dose of Relpax.  (R. 487.)  On August 11, 2011, Plaintiff reported to Dr. Mattiace that he was taking one or two Relpax per day for his migraines.  (R. 480.)  On August 30, 2011, Plaintiff reported to Geisinger PA Michelle Yasick that he rarely took only one Relpax for relief of migraine and stated that he could not function without it because his headaches become so severe that he could not work or resume activities of daily living.  (R. 360.)  Ms. Yasick recorded "[h]e reports 'migraines have ruined my life and my job.'  He states that he is self employed but because of the renal CA and migraines he cannot work full time."  (*Id.*)  On September 12, 2011, Plaintiff told Dr. Mattiace that his insurance reimbursement ran out and Dr. Mattiace noted "they are going to stop paying for his Relpax. Unfortunately, he has needed to take either one or two Relpax on a daily basis.  He has been doing that for years."  (R. 479.)  Dr. Mattiace further noted that Geisinger was going to write a letter to Medical Assistance to try to get the Relpax covered and Dr. Mattiace said he was willing to send a letter also, noting that "all other remedies have been tried and failed."  (R. 479.)  The

need for Relpax and lack of coverage for an adequate amount was repeated in October 31, 2011, office notes--Dr. Mattiace noted that Relpax was "[t]he only thing that seems to keep life livable for him."  (R. 478.)

On November 29, 2011, Dr. Carlson noted that Plaintiff reported having a headache every day, Relpax was the only thing that worked for him and his insurance company would only pay for six tablets where he needed as many as thirty-six tablets per month.  (R. 369-70.)  He opined that Plaintiff was "totally, permanently, and completely disabled from work."  (R. 369.)  In a letter to Plaintiff which was intended to be forwarded to the insurance company, Dr. Carlson noted that thirty-six tablets a month "would give you good headache control and function more normally."  (R. 370.)  Requests for additional Relpax do not appear to have been successful in that September 2012 records indicate Plaintiff's insurance was providing six Relpax per month.  (R. 474.)  Records also indicate that Dr. Carlson, and later Dr. Mattiace, provided an additional thirty-six Relpax every six months.  (R. 537.)

Geisinger Interventional Pain Center records from July 2012 indicate that Plaintiff reported to CRNP Nichole Harmon that he got a headache/migraine daily; the pain seemed to take over his entire head; he had neck pain with the migraine; the pain was throbbing, stabbing, and pounding; the pain ranged from 1/10 to 10/10 in

7

severity and it waxed and waned; the migraines were unpredictable though he had made multiple attempts to localize triggers; and the pain was associated with nausea/vomiting and light sensitivity. (R. 388.)  Jolly L. Ombao, M.D., assessed Plaintiff to have "[c]hronic migraines which have not responded to previous medications."  (R. 387.)  He administered botox injections as a diagnostic and therapeutic intervention.  (*Id.*)  At his visit with Dr. Ombao on March 5, 2013, Plaintiff reported that his headaches were in the fronto-temporal region and they occurred daily with auras at times.  (R. 453.)  Dr. Ombao noted that the July 2012 botox injections gave six months of twenty percent pain relief but Plaintiff still had daily migraines after the botox.  (*Id.*)  His assesment was "[c]hronic intractable migraines which have not responded to previous medications or botox."  (*Id.*)  He added a medication to Plaintiff's regimen and encouraged Plaintiff to pursue cognitive behavioral therapy and relaxation methods.  (*Id.*)

On March 13, 2013, Dr. Mattiace noted "[b]etween the Relpax and the hydrocodone, his life is tolerable."  (R. 473.)

Irfan A. Jafree, M.D., assessed "[h]eadaches medically refractory migraines" at a January 8, 2014, Geisinger Neurology consultation.  (R. 556.)  He noted that Plaintiff's typical headaches were "center of head, throbbing, photophobia, phonophobia, nausea.  Wakes up with them at times and could happen any time of day."  (R. 554.)  He also noted that Plaintiff had

8

tried "multiple medication including botox and the results were sub-satisfactory." (*Id.*) Dr. Jafree planned a different medication regimen. (R. 556.)

In March 2014, Dr. Mattiace noted that Plaintiff's migraines were about the same and "overall" he was "doing reasonably well." (R. 534.) Dr. Mattiace further commented that "things have been fairly stable for a number of years now." (R. 534.) In July 2014, Dr. Mattiace noted that Plaintiff's headaches had been "about the same" and he would continue to manage them with Relpax and PRN hydrocodone. (R. 536.) In August 2014, Dr. Mattiace recorded that Plaintiff was using six Relpax per month, Dr. Carlson had given him thirty-six at a time to last six months, that worked out "reasonably well," Dr. Mattiace planned to continue to provide the Relpax as Dr. Carlson had, and Plaintiff would continue to follow up with the Geisinger neurologist. (R. 537.)

**2. Hearing Testimony**[4]

At the September 23, 2014, hearing, Plaintiff testified that before his 2004 auto accident, he got migraines three to four times a week but after the accident he got them daily. (R. 38.) He said he was usually home because of the migraines and engaged in almost no activities in part because of them. (R. 35, 41-42.) Plaintiff stated that he had not worked anywhere since the 2004 accident and,

---

[4] Because the claimed errors relate to the ALJ's consideration of Plaintiff's migraine headaches, the Court focuses on testimony regarding Plaintiff's headache pain.

when he was self-employed as a licensed private detective, there were lots of periods where he was unable to work because of the migraines.  (R. 42, 46-47.)

Plaintiff testified that he was taking Relpax for his migraines and he needed to take two "to get rid of it for a number of hours." (R. 44-45.)  He also said his insurance would only pay for six pills a month so the medication only covered three migraines a month.  (R. 45.)  When the ALJ asked what he did for the rest of the month, Plaintiff responded that he stayed in bed and just had to wait for the migraine to subside.  (*Id.*)  He testified that he continued to see Dr. Mattiase regularly and was seeing a new neurologist and hoped to find medications that would work better.  (*Id.*)

**3.   ALJ Decision**

In her October 7, 2014, Decision, ALJ Wolfe set out the following Findings of Fact and Conclusions of Law:

> 1.   The claimant meets the insured status requirements of the Social Security Act through March 31, 2009.
>
> 2.   The claimant has not engaged in substantial gainful activity since March 2, 2004, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).
>
> 3.   The claimant has the following severe impairments: as of July 6, 2008 his severe impairments are headaches/migraines status post-concussion/post-concussion syndrome, cervicalgia; as of June 2014 seizure disorder (20 CFR 404.1520(c) and

10

416.920(c)).

4.   The claimant does not have an impairment
     or combination of impairments that meets
     or medically equals the severity of one
     of the listed impairments in 20 CFR Part
     404, Subpart P, Appendix 1 (20 CFR
     404.1520(d), 404.1525, 404.1526,
     416.920(d), 416.925 and 416.926).

5.   After careful consideration of the
     entire record, the undersigned finds
     that the claimant has the residual
     functional capacity to perform light
     work as defined in 20 CFR 404.1567(b)
     and 416.967(b).  The claimant can
     occasionally balance, stoop, crouch,
     crawl, kneel and climb but never on
     ladders, ropes or scaffolds.  He must
     avoid concentrated exposure to
     temperature extremes of cold/heat,
     humidity, excessive loud noise such as
     jackhammer and traffic noise,
     vibrations, fumes, odors, dusts, gases
     and poor ventilation.  He must avoid
     moderate exposure to hazards such as
     moving machinery and unprotected
     heights.

6.   The claimant is unable to perform any
     past relevant work (20 CFR 404.1565 and
     416.965).

7.   The claimant was born on January 2, 1965
     and was 39 years old, which is defined
     as a younger individual age 18-49, on
     the alleged disability onset date (20
     CFR 404.1563 and 416.963).

8.   The claimant has at least a high school
     education and is able to communicate in
     English (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not
     material to the determination of
     disability because using the Medical-
     Vocational Rules as a framework supports
     a finding that the claimant is "not

11

disabled," whether or not the claimant
has transferable job skills (See SSR 82-
41 and 20 CFR Part 404, Subpart P,
Appendix 2).

10. Considering the claimant's age,
education, work experience, and residual
functional capacity, there are jobs that
exist in significant numbers in the
national economy that the claimant can
perform (20 CFR 404.1569, 404.1569(a),
416.969, and 416.969(a)).

11. The claimant has not been under a
disability, as defined in the Social
Security Act, from March 2, 2004,
through the date of this decision (20
CFR 404.1520(g) and 416.920(g)).

(R. 15-26.)

Other relevant portions of the Decision will be referenced in

the Discussion section of this Memorandum.

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to

determine whether a claimant is disabled.[5]  It is necessary for the

---

[5]  "Disability" is defined as the "inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for
a continuous period of not less than 12 months . . . ."  42 U.S.C.
§ 423(d)(1)(A).  The Act further provides that an individual is
disabled

only if his physical or mental impairment or
impairments are of such severity that he is not
only unable to do his previous work but cannot,
considering his age, education, and work
experience, engage in any other kind of
substantial gainful work which exists in the
national economy, regardless of whether such
work exists in the immediate area in which he

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person

lives, or whether a specific job vacancy exists
for him, or whether he would be hired if he
applied for work.

42 U.S.C. § 423(d)(2)(A).

13

with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs which existed in significant numbers in the national economy.  (R. 25-26.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if

14

> it really constitutes not evidence but mere conclusion. *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence

15

included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Comm'f of Soc. Sec.*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *Albury v. Comm'r of Soc. Sec.*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct

16

meaningful judicial review."); *see also Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) (a remand is not required where it would not affect the outcome of the case.).   An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

Plaintiff asserts that the Acting Commissioner's decision should be reversed for the following reasons: 1) the ALJ erred in assessing Plaintiff's RFC; and 2) the ALJ erred in failing to give proper weight to Plaintiff's testimony. (Doc. 11 at 3.)   Despite the inadequate development of these arguments in Plaintiff's brief, the Court will review the issues raised given the remedial nature of the Social Security Act, *Dobrowolsky*, 606 F.2d at 406.   Because the claimed error regarding Plaintiff's testimony relates to the ALJ's RFC assessment, the Court will address the specific error before turning to the general RFC issue.

## A.    *Subjective Complaints*

Plaintiff contends the ALJ erred in not crediting his subjective complaints and limitations, specifically his testimony that he has daily migraine headaches.  (Doc. 11 at 4.)   Defendant responds "the ALJ comprehensively discussed Plaintiff's longitudinal treatment history, his benign examination and diagnostic findings, his favorable response to headache medication,

17

and the various medical opinions in the record stating he retained work-related abilities." (Doc. 12 at 17 (citing R. 18-24).) The Court concludes the ALJ did not properly consider evidence of record regarding Plaintiff's pain related to his migraine headaches. Because the Court cannot conclude that this error is harmless, remand for further consideration is warranted.

The Third Circuit Court of Appeals has stated that "[w]e 'ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.'" *Coleman v. Commissioner of Social Security*, 440 F. App'x 252, 253 (3d Cir. 2012) (not precedential) (quoting *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)). "Credibility determinations are the province of the ALJ and should only be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717 F.2d 871, 873 (3d Cir. 1983)).

The Social Security Regulations provide a framework within which a claimant's subjective complaints are to be considered. 20 C.F.R. §§ 404.1529, 416.929. First, symptoms such as pain, shortness of breath, and fatigue will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings.

18

20 C.F.R. §§ 404.1529(b), 416.929(b).  Once a medically

determinable impairment which results in such symptoms is found to

exist, the Commissioner must evaluate the intensity and persistence

of such symptoms to determine their impact on the claimant's

ability to work.  *Id.*  In so doing, the medical evidence of record

is considered along with the claimant's statements.  *Id.*

   At the time of the ALJ Decision in this case, Social Security

Ruling 96-7p provided guidance regarding the evaluation of a

claimant's statements about his or her symptoms:[6]

---

   [6]  SSR 96-7p was superseded by SSR 16-3p effective March 16,
2016.  SSR 16-3p, 2016 WL 1119029, at *1 (S.S.A.).  SSR 16-3p
eliminates the word "credibility" from the sub-regulatory policy
because the regulations do not use the term.  *Id.*  The Seventh
Circuit explained the change in *Cole v. Colvin*, 831 F.3d 411, 412
(7th Cir. 2016):

> Recently the Social Security Administration
> announced that it would no longer assess the
> "credibility" of an applicant's statements,
> but would instead focus on determining the
> "intensity and persistence of [the
> applicant's] symptoms." . . . The change in
> wording is meant to clarify that
> administrative law judges aren't in the
> business of impeaching claimants' character;
> obviously administrative law judges will
> continue to assess the credibility of pain
> assertions by applicants, especially as such
> assertions often cannot be either credited or
> rejected on the basis of medical evidence.

*Id.*  Substantively, SSR 16-3p's guidance concerning the evaluation
of subjective symptoms in disability claims is largely consistent
with the policies set out in SSR 96-7p regarding the assessment of
the credibility of an individual's statements.  *See*, *e.g.*,
*Sponheimer v. Comm'r of Soc. Sec.*, Civ. No. 15-4180, 2016 WL
4743630, at *6 n.2 (D.N.J. Sept. 8, 2016).  In this case, ALJ Wolfe
issued her Decision prior to the effective date of SSR 16-3p so her

> In general, the extent to which an
> individual's statements about symptoms can be
> relied upon as probative evidence in
> determining whether the individual is
> disabled depends on the credibility of the
> statements.  In basic terms, the credibility
> of an individual's statements about pain or
> other symptoms and their functional effects
> is the degree to which the statements can be
> believed and accepted as true.  When
> evaluating the credibility of an individual's
> statements, the adjudicator must consider the
> entire case record and give specific reasons
> for the weight given to the individual's
> statements.

SSR 96-7p, 1996 WL 374186, at *4 (S.S.A.).  The ruling adds that

"[o]ne strong indication of the credibility of an individual's

statements is their consistency, both internally and with other

information in the case record."  SSR 96-7p, 1996 WL 374186, at *5.

     The Third Circuit has explained:

> An ALJ must give serious consideration
> to a claimant's subjective complaints of
> pain, even where those complaints are not
> supported by objective evidence.  *Ferguson v.
> Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985).
> "While there must be objective evidence of
> some condition that could reasonably produce
> pain, there need not be objective evidence of
> the pain itself."  *Green* [*v. Schweiker*, 749
> F.2d 1066, 1071 (3d Cir. 1984)].  Where
> medical evidence does support a claimant's
> complaints of pain, the complaints should
> then be given "great weight" and may not be
> disregarded unless there exists contradictory
> medical evidence.  *Carter* [*v. Railroad
> Retirement Bd.*, 834 F.2d 62, 65 (3d Cir.
> 1987)]; *Ferguson*, 765 F.2d at 37.

---

obligation was to follow the guidance set out in SSR 96-7p.
Therefore, the Court references the standards set out in SSR 96-7p
in this Memorandum.

*Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993).

The regulations and relevant rulings set out factors which are considered relevant to symptoms such as pain: 1) activities of daily living; 2) the location, duration, frequency and intensity of the pain or other symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness and side effects of medications taken to alleviate symptoms; 5) treatment received other than medication intended to relieve pain or other symptoms; 6) other measures used for pain/symptom relief; and 7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i-vii), 416.929(c)(3)(i-vii); SSR 96-7, 1996 WL 374186, at *3; SSR 16-3p, 2016 WL 1119029, at *7.

Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms but "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."  (R. 18-19.) The Court's review of the record does not find such an explanation. (*See* R. 18-24.)

Regarding the headache pain at issue in this action, the ALJ recognized that Plaintiff had the severe impairment of headaches/migraine status post-concussion/post-concussion syndrome. (R. 15)  Her extensive review of evidence referenced Plaintiff's

21

complaints of headache pain numerous times, including: complaints to his neurologist, John P. Carlson, M.D.; he was being followed for his migraines by William J. Mattiace, M.D.; he received botox injections to treat his headaches at the Inteventional Pain Center; he had seen another neurologist, Irfan A. Jafree, M.D., for complaints of headache; and a 2009 MRI of the brain conducted in part due to complaints of worsening headaches and to rule out an intracranial mass was normal.  (R. 19-22.)

ALJ Wolfe's only *discussion* of the pain associated with Plaintiff's headaches is found in her consideration of Dr. Carlson's opinion that Plaintiff was "totally, permanently, and completely disabled from work."  (R. 24 (citing Exhibit B5F/96 [R. 369]).)  ALJ Wolfe gave the opinion little weight because it was "based primarily on the claimant's subjective complaints" and the opinion was

> purely conclusory, without any supporting explanation or rationale.  The claimant [sic] EEG in September 2013 was normal (Exhibit B12F/37 [R. 575]).  The neurological examination by Dr. Jafree in January 2014 was within normal limits (Exhibit B12F/17 [R. 555]).  There is nothing in the record to substantiate Dr. Carlson's opinion other than the claimant's subjective complaints. Furthermore, Dr. Carlson noted in a letter to send to the claimant's insurance company for approval of medication that the medication "controls" his headaches and he would be able to function normally with the medication (Exhibit B15F/97 [R. 370]).  These statements are inconsistent with Dr. Carlson's opinion that the claimant is disabled.

22

(R. 24.)   The quoted analysis shows that ALJ Wolfe inferentially made a finding that Plaintiff's statements regarding his headache pain were not entirely credible and the record shows she does so without the required explanation.

Relevant guidance regarding the ALJ's obligation to make a specific credibility finding is quite detailed:

> The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility.  The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.  It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave the individual's statements and the reasons for that weight.  The documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

SSR 96-7p, 1996 WL 374186, at *4.

ALJ Wolfe's conclusory statement regarding Plaintiff's credibility (R. 19) clearly does not satisfy the obligation explained in SSR 96-7p.  Importantly, the ALJ did not mention Plaintiff's extensive testimony about limitations related to

23

migraine headache pain--subjective complaints which were to be given serious consideration.[7] *Mason*, 994 F.2d at 1067.  The ALJ did not discuss any of the factors which are to be considered relevant to symptoms such as pain except for the effectiveness of medications taken to alleviate pain.  *See*, *e.g.*, 20 C.F.R. § 404.1529(c)(3).  ALJ Wolfe's mention of the effectiveness of pain medication does not suffice as an explanation for a credibility determination for several reasons.  First, the factor is not considered in the context of the required explanation--the effectiveness of the medication is considered only in the context of the ALJ's assessment of Dr. Carlson's opinion.  (R. 24.) Second, medication effectiveness is the *only* factor mentioned.[8] (*Id.*)  Third, ALJ Wolfe misconstrued the evidence relied upon--her notation that "medication 'controls' his headaches and he would be able to function normally with the medication," (R. 24 [quoting R. 379]), is not an accurate assessment of Dr. Carlson's statement. In a letter to Plaintiff which was intended to be forwarded to Plaintiff's insurance company, Dr. Carlson briefly set out the history of Plaintiff's headaches (including their progression from occurring a few times a week to daily) and stated that the "only

---

[7]  *See supra* pp. 9-10.

[8]  While there is no absolute requirement that an ALJ discuss all regulatory factors, an ALJ should analyze "as many of these factors as is applicable in order to provide sufficient findings for judicial review."  *Centano v. Comm'r of Soc. Sec.*, Civ. No. 09-6023, 2010 WL 5068141, at *8 (D.N.J. Dec. 6, 2010).

medication" which gave him relief was Relpax.  (R. 369.)  He then said

> [y]ou are struggling to control your
> headaches because you only get 6 tablets a
> month through your insurance company.
>
> I would forward this letter to your
> insurance company to ask them if there could
> be an exception for you so that you get as
> many as 36 tablets a month which would give
> you good headache control and function more
> normally.

(R. 369-70.)

The problem with the ALJ's interpretation of Dr. Carlson's statement is twofold.  A discrepancy exists between an ability to "function more normally" with adequate medication (R. 370) and the ability "to function normally with his medication" (R. 24)--Dr. Carlson's description of Plaintiff's ability in relative terms should not be construed to equate with normal functioning as ALJ Wolfe did in her assessment.  Moreover, Dr. Carlson's letter indicates that Relpax *would* give Plaintiff good headache control *if a sufficient quantity were available*.  That quantity was not available at the time Dr. Carlson wrote the letter on November 29, 2011, and it was not available as of August 6, 2014, when Dr. Mattiace noted that Plaintiff was using six per month and was being given thirty-six at a time by Dr. Carlson, a practice Dr. Mattiace intended to continue.  (R. 369-70, 537.)  Thus, although Relpax provided a potential for good headache control, the record does not support a conclusion that the potential was realized.  In addition

25

to evidence that Plaintiff did not have access to a sufficient quantity of Relpax, a conclusion that Plaintiff's headaches were consistently controlled with medication is contradicted by Dr. Jafree's January 8, 2014, assessment of "[h]eadaches medically refractory migraines" (R. 556) and similar diagnoses of record (*see*, *e.g.*, R. 453).[9]

Finally, the ALJ's inference that Plaintiff's subjective complaints regarding his headaches were not entirely credible because of normal test results--including a September 2013 normal EEG and Dr. Jafree's January 2014 normal neurological examination (R. 24)--is also problematic.  First, it is noteworthy that Dr. Jafree diagnosed "medically refractory migraines" at the same office visit where his neurological exam was normal.  (R. 555-56.) More importantly, normal examination and diagnostic testing do not undermine a migraine diagnosis and/or subjective complaints.

> Numerous courts have recognized that migraine headaches "cannot be detected by imaging techniques, laboratory tests, or physical examination."  *Abbruzzese v. Astrue*, 2010 WL 5140615 at *7 (W.D. Pa. 2010); *Parsley v. Astrue*, 2009 WWL 1940365 at *4 (W.D. Pa. 2009) (noting that migraine headaches "do not stem from a physical or chemical abnormality which can be detected by imaging techniques or laboratory tests"), citing *Diaz v. Barnhart*, 2002 WL 3234945 at

---

[9]  "Refractory migraine," also called "intractable migraine," and/or "status migraoinosus," is a term used to describe "a persistent migraine that is either 1) difficult to treat or b) fails respond to standard and/or aggressive treatments." https://migraine.com/blog/the-ins-and-outs-of-intractable.

>*6 (E.D. Pa. 2002) (same); *Strickland v. Barnhart*, 107 F. App'x 685, 689 (7th Cir. 2004) (noting that "nothing in the record suggests neurological tests can either confirm the existence of migraines or there [sic] likely severity" and the treating physician's conclusion that the claimant suffered from severe migraines "even in the face of normal test results shows that there are not diagnostic tests that work particularly well for migraines."); *Federman v. Chater*, 1996 WL 107291 at *2 (S.D.N.Y. 1996) (noting that because there is no test for migraine headaches, when presented with documented allegations of symptoms which are entirely consistent with the symptomatology for evaluating the claimed disorder, the Secretary cannot rely on the ALJ's rejection of the claimant's testimony based on the mere absence of objective evidence.") (citations omitted). "Doctors diagnose migraines when symptoms are typical and results of physical examination (which includes a neurologic examination) are normal. No procedure can confirm the diagnosis." *Abbruzzese*, 2010 WL 5140615 at *7 (quoting www.merckmanuals.com/home).

*Salberg v. Astrue*, Civ. A. No. 11-175, 2012 WL 4478310, at *13 (W.D. Pa. Sept. 27, 2012).

Because of the lack of objective verification, "[a]n ALJ must be particularly diligent in making credibility determinations with regard to migraines." *Thomas v. Colvin*, No. 1:14-CV-00274-TFM, 2015 WL 4067147, at *5 (W.D. Pa. July 2, 2015) (internal citation omitted). Courts look at a number of factors in determining whether a claimant's complaints of migraines are credible, including:

>whether the claimant has been diagnosed with migraines; whether the claimant has received

27

> treatment and medication; the length of the
> history of complaints and treatment relating
> to migraines; the alleged severity and
> frequency; the symptoms the claimant alleges
> the migraines cause; and whether the record
> contains any statements from doctors
> questioning the alleged frequency or
> severity.

*Kulbacki v. Colvin*, 2016 WL 2609984, at *6 (W.D. Pa. May 6, 2016)

(citing *Thomas*, 2015 WL 4067147, at *5-7).  Relevant to

consideration of the functional limitations caused by episodic

symptoms, *Abbruzzese* noted that "headaches are episodic, thus

affecting [the] ability to work on a regular, sustained basis,"

2010 WL 5140615, at *8, and the Seventh Circuit Court of Appeals

explained that "full-time work does not allow for the flexibility

to work around periods of incapacitation," *Moore v. Colvin*, 743

F.3d 1118, 1126 (7th Cir. 2014).

    Not only do these observations and principles provide a

framework for the proper consideration of Plaintiff's migraine

headache complaints, they also point to error in ALJ Wolfe's

conclusion that Dr. Carlson's opinion was entitled to little weight

on the basis that "[t]here is nothing in the record to substantiate

Dr. Carlson's opinion other than the claimant's subjective

complaints."  (R. 24.)  Thus, upon remand, a much more thorough and

legally appropriate analysis of Plaintiff's headache impairment

must be conducted.

    Additional consideration should be conducted in accord with

the instruction found in SSR 97-6p that "[w]hen additional

28

information is needed to assess the credibility of the individual's statements about symptoms and their effects, the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements." 1996 WL 374186, at *3. In this case, further evidence is likely required regarding Plaintiff's ongoing problems securing effective medication (*see*, *e.g.*, R. 370, 479, 538, 554) and clarification of the relative terms used by his primary care doctor to describe his status (*e.g.*, doing "reasonably well" (R. 480, 536, 537), "his life is tolerable" (R. 473), "things have been fairly stable" (R. 534)).[10]

## B.   *Residual Functional Capacity*

Plaintiff asserts that there is no evidence of record that he retained the RFC assessed by ALJ Wolfe. (Doc. 11 at 3.) Defendant responds that substantial evidence supports the ALJ's RFC. (Doc. 12 at 7.) Because the Court has concluded that remand is required for the reasons set out above, reevaluation of Plaintiff's RFC is

---

[10]   Additional evidence may include consideration of, and further information regarding, Dr. Mattiace's November 4, 2014, opinion that Plaintiff experienced severe migraine headaches daily and he was incapable of sedentary work when he was in the throes of a migraine headache. (R. 591.) This evidence was not before the ALJ and was rejected by the Appeals Council (R. 2), but it is relevant to ongoing migraine pain control difficulties. *See Szubak v. Sec'y of Health & Hum. Servs.*, 745 F.2d 831, 833 (3d Cir. 1984).

29

required.[11]

## V. Conclusion

For the reasons discussed above, the Court concludes the ALJ's credibility and RFC findings are not supported by substantial evidence.  Therefore, Plaintiff's appeal of the Acting Commissioner's decision is properly granted and this matter is remanded to the Acting Commissioner for further consideration consistent with this opinion.  An appropriate Order is filed simultaneously with this Memorandum.


                                S/Richard P. Conaboy
                                RICHARD P. CONABOY
                                United States District Judge

DATED: March 3, 2017

---

[11]   The regulations explain that "symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting.  Your residual functional capacity is the most you can do despite your limitations.  We will assess your residual functional capacity based on all the relevant evidence in your case record."  20 C.F.R. 404. 1545(a)(1), 416.945(a)(1).